**SO ORDERED.**

**SIGNED this 15 day of July, 2026.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

IN RE:                                                    CASE NO. 25-04908-5-DMW

BLACKBEARD'S TRIPLE PLAY, LLC

                                                         CHAPTER 11

          DEBTOR

## MEMORANDUM OPINION IN SUPPORT OF ORDER IMPOSING SANCTIONS

This matter came on to be heard upon the Debtor's Emergency Motion for Sanctions for Violation of the Automatic Stay ("Emergency Motion") filed by Blackbeard's Triple Play, LLC ("Debtor") on December 29, 2025 and the court's December 30, 2025 Interim Order Granting Debtor's Motion for Sanctions for Violation of the Automatic Stay and Order to Show Cause ("Interim Order"). The court conducted hearings in Raleigh, North Carolina on April 6, 2026 and April 13, 2026. David J. Haidt, Esq. appeared for the Debtor, Joseph Z. Frost, Esq. appeared for The LCF Group, Inc. ("LCF"), J.M. Cook, Esq. ("Trustee") appeared as Subchapter V trustee, and Linda B. Green, Esq. appeared for the United States Bankruptcy Administrator.[1] At the April 13, 2026 hearing, Joseph S. Maniscalco, Esq. also appeared for LCF, with Mr. Frost acting as E.D.N.C. Local Civil Rule 83.1(d) counsel. At the conclusion of the April 13, 2026 hearing, the court

_____
[1] Ms. Green was present at the April 6, 2026 hearing.

imposed sanctions against LCF, and on April 23, 2026, the court entered an Order imposing the sanctions. In support of the court's prior Order, and based upon the pleadings, the evidence presented, the arguments of counsel and the case record, the court makes the following findings of fact of conclusions of law:

1. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the court has the authority to hear and determine the matter pursuant to 28 U.S.C. § 157(b)(1). The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code on December 10, 2025. The Debtor operates a restaurant by the name of Blackbeard's Triple Play in New Bern, North Carolina and employs approximately sixty employees. The Debtor accepts various forms of payment from customers, including by credit card.

3. The Debtor and LCF are parties to a purported agreement whereby LCF advanced funds to the Debtor in exchange for repayment from the Debtor's ongoing receivables. The Debtor included LCF on its list of creditors filed with the petition, and LCF received notice of the Debtor's case at the address of 3000 Marcus Ave., Suite 2W15 in New Hyde Park, New York. The Debtor's counsel also communicated by email with Michael Silva, a supervisor within the "lien department" at LCF, as well as counsel for LCF on December 12, 2025.

4. "The automatic stay of 11 U.S.C. § 362 became effective immediately upon the petition filing pursuant to 11 U.S.C. § 362(a)." *In re Black*, No. 16-00230-5-JNC, 2016 WL 1043674, at *1 (Bankr. E.D.N.C. Mar. 14, 2016). On December 15, 2025, the Debtor filed a

2

motion stating that various creditors, including LCF, had enforced purported liens through holds on the Debtor's accounts receivable. These holds prevented the Debtor from receiving funds from various entities that processed credit card payments in favor of the Debtor. On December 17, 2025, the court entered an Order directing LCF and other creditors to release any liens asserted against the Debtor's cash collateral assets.

5.      On December 23, 2025, the Debtor became aware that "Last Chance Funding" had asserted a UCC lien on the Debtor's account with Square Up, an entity that facilitates the Debtor's point-of-sale system. LCF has previously stated its name as "Last Chance Funding Inc." in notices sent to other entities.[2]

6.      After the Debtor learned of the hold on its account with Square Up, the Debtor stopped accepting payments by credit card. Although the payments may have continued to process successfully, the Debtor would be unable to receive the funds, as Square Up would hold them pursuant to the asserted UCC lien. The Debtor determined it could not afford to provide food and beverages to its customers without receiving prompt payment from its credit card processor.

7.      The Debtor filed the Emergency Motion on December 29, 2025, requesting an expedited, preliminary hearing for the court to consider granting interim relief in favor of the Debtor. The court conducted a hearing on December 30, 2025 and entered the Interim Order that same day. The Interim Order found that LCF appeared to have violated the automatic stay imposed by 11 U.S.C. § 362 by asserting a UCC lien post-petition that resulted in a hold being placed on the Debtor's point-of-sale system and related account. In the Interim Order, the court directed LCF immediately to cease and desist all collections and lien assertion efforts against the Debtor and release its UCC lien against the Debtor's Square account. The Interim Order also scheduled

---

[2] On December 15, 2025, the Debtor filed with the court a UCC lien notice issued by LCF to payment processor Stripe, Inc., wherein LCF referred to itself as "The LCF Group, Inc. f/k/a/ Last Chance Funding Inc."

a return hearing and directed that Mr. Silva and Mr. Maniscalco appear to show cause as to why LCF should not be held in contempt and sanctioned for the conduct alleged by the Debtor.

8. The court scheduled the return hearing to be conducted on January 5, 2026, but prior to that hearing, the Debtor and LCF requested jointly a continuance of the hearing, stating that "as of January 2, 2026, the Debtor appears able to process debit and credit card transactions in connection with its ongoing business operations." The court granted the requested continuance as well as subsequent continuances requested by the parties, until the April 6, 2026 hearing.

9. Mr. Silva and Mr. Maniscalco failed to appear at the April 6, 2026 hearing, but the Debtor's principal, Billy Dale Overbee, and the Debtor's manager and bookkeeper, Angela Hager, both testified. At that hearing, the court requested additional evidence from the Debtor regarding the actual damages suffered. The Debtor presented additional evidence at the April 13, 2026 hearing, and Mr. Silva and Mr. Maniscalco also appeared before the court. Mr. Silva testified as to certain measures taken by LCF to cease collection efforts against the Debtor.

10. The Debtor ultimately received the funds that were withheld by the payment processor; however, the Debtor seeks damages beyond release of the funds, as mere remuneration is insufficient to compensate the Debtor. At the hearings on April 6, 2026 and April 13, 2026, the evidence presented by the Debtor established the following facts relevant to the sequence of events at issue:

    a. While the hold was in place, the Debtor's personnel informed customers that the restaurant was only accepting cash payments. Customers were directed to the Debtor's automated teller machine, but some customers left the premises upon being told the Debtor was not accepting credit cards. In the area surrounding the Debtor's location,

patrons have approximately eight alternative dining options within walking distance of the Debtor.

b.  During the period from December 23, 2025 through January 4, 2026, the Debtor had sales of $85,854.10 and total profit of $25,399.00 ("Reduced Profit").  During that same period a year earlier, the Debtor had sales of $105,666.11 and total profit of $36,623.00 ("Prior Year Profit").  During 2025, the Debtor had seen, on average, a twenty-five percent increase in sales over the prior year. The month of December is historically one of the Debtor's busiest months, due to holiday parties, the Debtor being one of the only local restaurants open on Christmas Day, and high sales on New Year's Eve.  The Debtor relies on increased sales in December to counteract lower sales in the months of January and February.

c.  Before the Debtor became aware of the hold on its account, the Debtor accepted credit card payments as usual.  Even though the Debtor did not receive in the ordinary course the funds related to those sales, the Debtor was obligated to remit any gratuities from those sales to its employees out of cash on hand.  Similarly, the Debtor had to use cash on hand to replenish its alcohol inventory that must be paid in full prior to receipt of goods, even though the Debtor had not received credit card payments related to much of the alcohol being replenished.

d.  The Debtor, on average, purchases food supplies twice weekly.  The Debtor's food distributors typically debit payment from the Debtor's bank account within seven days of delivering food.  Although the Debtor sold food to guests using credit cards during the week following its delivery (before the Debtor stopped accepting credit cards), the Debtor did not receive promptly the funds from sales by credit card.  Some payments

5

to vendors were not honored by the Debtor's bank, because the Debtor had insufficient funds in its account when vendors attempted to debit payment from the Debtor's account. The Debtor incurred bank and vendor fees totaling $4,200.00 as a result of the hold that LCF placed on the credit card processor account.  Some vendors now require the Debtor to pay by cashier's check.

e.      The Debtor hosts live music at the restaurant, which musical groups are a "huge draw" for customers.  Due to the credit card funds being withheld from the Debtor, the Debtor was forced to cancel some performances to preserve its cash balances.  Some customers complained about the absence of live music.

f.      During the time the holds were in place, the Debtor lost at least four employees due to the drop in sales and uncertainty among staff regarding the Debtor's stability maintaining operations.  The Debtor's management was forced to recruit and interview replacement staff to remediate the loss.

11.      "[A] party seeking to recover damages for violation of the automatic stay must establish three elements: 1) that a violation of the stay occurred; 2) that the violation was willful; and 3) that the violation caused actual damages." *In re Kimbler*, 624 B.R. 774, 779 (Bankr. E.D.N.C. 2020) (quoting *In re Ennis*, No. 14-02188-5-SWH, 2015 WL 6555392, at *5 (Bankr. E.D.N.C. Oct. 28, 2015)).

12.      "[W]illfulness does not refer to the intent to violate the automatic stay, but the intent to commit the act which violates the automatic stay." *In re Lofton*, 385 B.R. 133, 140 (Bankr. E.D.N.C. 2008).  "A willful violation of the stay occurs when a creditor has adequate notice of the bankruptcy and intentionally commits an act that violates the stay." *In re Sculky*, 182 B.R. 706, 708 (Bankr. E.D. Pa. 1995).

6

13.     LCF had notice of the Debtor's bankruptcy petition as early as December 12, 2025, and LCF willfully violated the stay by asserting and maintaining its UCC lien against the Debtor's account receivable post-petition.  As a result of LCF's stay violation, the Debtor suffered damages including loss of its fresh start, loss of income, reputational harm and attorney's fees and expenses. Monetary sanctions against LCF pursuant to 11 U.S.C. § 362(k) are appropriate.

14.     The difference between the Prior Year Profit and the Reduced Profit totals $11,224.00 and correlates to the loss of business while the Debtor could not accept credit card payments.  If the amount of $11,224.00 is increased by twenty-five percent to reflect the Debtor's trending increase in sales compared to the prior year, the result is $14,030.00 ("Profit Damages") to reflect the additional profit the Debtor would have realized absent any holds on accounts.[3]

15.     The Profit Damages figure does not include the $4,200.00 bank and vendor fees assessed against the Debtor.  It also does not include the immeasurable damage to the Debtor's reputation, from the perspective of both customers and employees, caused by its inability to accept credit card payments.  Lastly, the Profit Damages do not account for time spent by Mr. Overbee and Ms. Hager investigating the hold, managing the Debtor's business in light of the hold, and testifying before the court instead of overseeing ordinary business operations.  The Profit Damages should be trebled to account for these other losses experienced by the Debtor, especially in light of the timing and extent of LCF's stay violation.  LCF should have a system in place to retract UCC lien notices immediately upon learning of a debtor filing a bankruptcy petition, and the

---

[3] The court performed this quick calculation on the day of the hearing.  A more accurate calculation would increase the sales figure by twenty-five percent, but that would require implementing a hypothetical expense that would be associated with the upward trend in sales for the current year.  An alternative calculation, using the figures available on the record, would involve applying a twenty-five percent increase to last year's profit, compared to the profit for the current year.  Using the Debtor's meticulous record of income and expense year over year, the Prior Year Profit would be increased by twenty-five percent ($45,778.75) and compared to the actual profit from the current year ($25,399.00).  The difference between those two numbers ($20,379.75) would more accurately reflect the additional profit the Debtor would have realized absent any holds on accounts.  The court will not alter its prior ruling, but it notes that perhaps even higher sanctions against LCF would have been appropriate.

maintenance of a lien more than ten days after a petition is filed is absurd.  LCF argues that it cannot control the speed at which a processor releases a hold after LCF releases its lien notice; however, LCF produced no evidence to show that it had taken any reasonable action to release its lien on the account in question.  LCF's decision to maintain a post-petition lien on the Debtor's cash collateral makes it liable for the ancillary effects of a hold, including the expected time it takes the processing company to resume remitting proceeds back to the Debtor.  The trebling of the Profit Damages is warranted under the circumstances of this case.

16.     The Debtor's counsel has spent numerous hours attempting to achieve release of LCF's lien on the Debtor's accounts, beginning two days after the petition date when counsel first reached out to LCF to notify it of the bankruptcy filing.  The Debtor's counsel accrued fees and expenses totaling $21,640.53 through April 8, 2026, plus an additional $1,500.00 in fees and expenses relating to the April 13, 2026 hearing.

17.     The Trustee has also incurred fees relating to this matter, including his appearance at multiple hearings.  The Trustee's fees relating to LCF's failure to release its lien total $3,000.00.

18.     For the reasons stated above, the court ordered LCF to pay to the Debtor sanctions in the amount of $68,230.53, comprising $14,030.00 Profit Damages trebled to the amount of $42,090.00, $23,140.53 in fees and expenses incurred by the Debtor's counsel and $3,000.00 in fees incurred by the Trustee.

END OF DOCUMENT